(82 South. 202)

No. 23165.

PARKS et al. v. HUGHES, Sheriff, et al.

(May 5, 1919. Rehearing Denied June 2, 1919.)

*(Syllabus by Editorial Staff.)*

1. CORPORATIONS ⊜⇒473 — NOTICE TO OFFICERS AS BINDING ON STOCKHOLDERS.

Stockholders of a corporation, where uniformly represented by and affiliated with certain officers and stockholders in the corporation and leaving all their matter completely in their hands, both in the voting of their stock and in the acquisition of bonds, are charged with the knowledge which their representatives possessed of infirmities of the bond, although they did not have actual notice thereof.

2. CORPORATIONS ⊜⇒482(5)—BONDHOLDERS— GOOD FAITH—BURDEN OF PROOF.

After a showing of fraud has been made in the issuance of corporate bonds, the burden is shifted to the bondholders in foreclosure of a mortgage securing the bonds to prove good faith under Negotiable Instruments Law, § 59.

3. CORPORATIONS ⊜⇒317(2)—OFFICERS—SALE TO CORPORATION — ISSUANCE OF BONDS — FRAUD.

A transaction by which one who was treasurer and field manager of an oil corporation, charged with looking after its affairs of such character, received $8,000 worth of bonds from the corporation for property, which shortly prior to the sale to the corporation he had acquired for only $200, was fraudulent.

4. CORPORATIONS ⊜⇒425(4) — FRAUDULENT ACTS OF OFFICERS — RIGHTS OF CORPORATION.

Neither the receiver of a corporation nor the corporation itself is estopped to enjoin executory proceedings in a suit by bondholders to foreclose a mortgage on the property of the corporation and to annul the mortgage and bonds on the ground that there was fraud in the issuance of the bonds by officers of the corporation, and that the issuance of the bonds and the foreclosure proceedings were steps taken to freeze out certain stockholders.

O'Niell, J., dissenting.

Appeal from First Judicial District Court, Parish of Caddo; J. R. Land, Judge.

Suit by Percy D. Parks and A. R. Robertson, receivers of the Interstate Oil, Gas & Development Company, against T. R. Hughes, Sheriff, and others. Decree for defendants, and plaintiffs appeal. Reversed and remanded.

See, also, 143 La. 1063, 79 South. 861.

Dart, Kernan & Dart, of New Orleans, and Blanchard, Goldstein & Walker, of Shreveport, for appellants.

Arthur B. Leopold and Girault Farrar, both of New Orleans, and Barret & Files, of Shreveport, for appellees.

DAWKINS, J. This is a suit by the receivers of the Interstate Oil, Gas & Development Company to enjoin executory proceedings in the matter of Morris J. Samuels and others against the said company, and to annul the mortgage and bonds upon which the said process issued. Plaintiffs allege that the said mortgage and bonds were fraudulently issued, and were without consideration to the knowledge of the plaintiffs in writ. Then follows a detailed recital of the history of the company and its affairs. They further alleged that certain individuals, assuming to act for the company, though never having been elected in fact or in law had pretended to authorize and execute said mortgage and bonds; that, in truth and in fact, said bonds and mortgage had been drawn up and signed by said individuals, pretending to act as officers of said company as aforesaid at different times and places, out of the presence of the witnesses and notary, and that same were not authentic; that C. L. Darrah, a stockholder, director, field manager, and treasurer of the company, had obtained from one Geo. W. Hurdle a lease upon a certain 80 acres of land near that of the said company for the price of $200, which was paid through said officer and agent; that title to said land was taken in the name of said Darrah, and that subsequently, through fraud and collusion with

other officers, agents, and directors of the company, Darrah attempted to sell the said property to the company for a price of $8,000; that at said time the company was "almost insolvent," due to the fraud and mismanagement of the said Darrah and its general manager, R. M. Chisholm, together with other agents and officers thereof, who had paid themselves exorbitant salaries and fees, without any corresponding benefit to the company, and who had sold its stock at an enormous discount, paying large commissions and fees thereon, in violation of law and the charter rights of the stockholders; that in the fraudulent scheme by which Darrah acquired and attempted to sell to the company the aforesaid land it was understood with his coconspirators that he should receive $4,000 in cash, and the balance in the first mortgage gold bonds of the company, but that instead he was given and received $8,000 of said bonds; and that said bonds and mortgage were null and void for the reason that the said Darrah was acting for the company in the purchase of said property, and could not enrich himself at its expense through said fraudulent schemes on the part of himself and the other officers and agents of the company. The receivers further allege that after said fraudulent transaction was discovered by the stockholders, the said Darrah and others pretended to make a retrocession of the said bonds to the said company; but, in truth and in fact, instead of returning the said $8,000, worth of bonds as promised, he returned stock of the company, and later negotiated said bonds to the plaintiffs in writ, who were legally charged with, and who in fact had, full knowledge of all of the matters and things complained of. They further allege that the said bonds were not negotiable under the laws of this state, and that the said plaintiffs in writ were merely the agents and instrumentalities through which the said Darrah, Chisholm, and others were attempting to acquire all of the property and assets of the company to the serious injury and detriment of the other stockholders.

In the alternative, the receivers further allege that, if the bonds and mortgage should be held to be valid, the suit to foreclose thereon was premature, in that only the coupons maturing January 1, 1917, had become due, and that, under the terms of the mortgage, neither bonds nor coupons were to become exigible until said coupons were past due as much as a year; that said officers and individuals, knowing that receivers had been appointed, acting in collusion with plaintiffs in writ, withdrew all of the funds of the company from bank just before said appointment, and paid to themselves fees and salaries, leaving no funds with which to pay said coupons, and with the understanding on the part of plaintiffs that they should foreclose, hoping thereby to "freeze out" the other stockholders and to reorganize the company for their own benefit, as they had privately announced. They allege further in the alternative that the seizure was excessive, because the bonds do not mature until 1922; that, if it should be found that plaintiffs are entitled to foreclose, the process should be confined to the naked realty, for the reason that the movables were not covered by the mortgage or subject to seizure.

They prayed for judgment appropriate to the allegations of their petition.

Defendants first filed an exception of no cause of action, which was overruled, and they answered, denying the allegations of the petition, except as to the seizure. They further averred that they were the owners and holders of the said bonds, for a valuable consideration before maturity, and that they were in every way valid and due; that, if it should be found that they were not due on

their faces, then the same were due because "said company has become insolvent and a forced cession of its property has been made by said company, and receivers have been appointed to take charge of the property," and for the further reason that "all of the property, rights, and credits of said company had been sequestered in the suit of Hickman Crawford Drilling Co. v. Interstate Oil, Gas. & Development Co. (No. 21974)," and, because of the fact that the property and assets of the company were becoming worthless, it was necessary to foreclose in order to secure payment of said indebtedness.

Defendants prayed that the injunction be dissolved, and for $1,000 as damages for attorney's fees.

On February 25, 1918, a plea of estoppel was filed, presumably in the clerk's office, for we find no mention thereof in the minutes of that date, in which it is set out that—

"Inasmuch as the receivers herein are suing as representatives of the Interstate Oil, Gas & Development Company, a corporation, and are seeking to exercise rights belonging to said corporation, * * * they are now estopped to attack the acts of said corporation performed by it in the exercise of its control and management of its affairs. * * * *".

After a trial on the merits, the lower court sustained the plea of estoppel, and the plaintiffs have appealed.

## Opinion.

The Interstate Oil, Gas & Development Company was organized in 1912, with a capital stock of $60,000, and shortly thereafter acquired from R. M. Chisholm and W. L. Wright certain small tracts of land in the oil fields of Caddo parish for the price and sum of $24,000, of which $10,000 was paid in cash, and for the balance they received stock in the company amounting to $14,000. Thereafter Wright sold another small tract to the company for $10,000, $7,000 of which was paid cash, and the remainder, $3,000,

was also represented by stock in the company. The balance of the stock was sold, mostly in small lots or blocks, to various persons in Louisiana, Mississippi, Tennessee, and elsewhere. L. S. Boudreaux became president, Horace Rutherford, vice president, M. H. Morrill, secretary, Chas. H. Darrah, treasurer and field manager, and R. M. Chisholm, general manager. Subsequently the capital was raised to $100,000, and later it was increased to $200,000. Approximately $126,000 worth of stock had been issued and was outstanding when a general meeting of the stockholders was held in New Orleans, the domicile of the company in October, 1916, at which a long and acrimonious discussion of the company's affairs was had, finally resulting in a well-defined division between certain individuals and stockholders, representing the majority and minority interests, respectively. The majority, of course, carried its policies and contentions in every test of strength, and eventually elected its board of directors and officers for the ensuing year.

However, the division and confusion continued to develop, and on December 18, 1916, certain of the minority stockholders applied to the civil district court for the parish of Orleans for the appointment of a receiver, under numerous charges of fraud and mismanagement of the company's affairs on the part of its officers and directors. On January 16, 1917, the company, through its attorneys, appeared and consented to the appointment of a receiver, acting, as they alleged, under a resolution of the board of directors in which it was admitted that, on account of said suit for receiver, the company would be unable to meet its debts, and that it might be able, under the administration of a receiver, to work out its affairs. The resolution instructed the counsel to answer accordingly, and there was judgment appointing the plaintiffs herein receivers on said 16th day of January, 1917. On the same

day the suit of M. J. Samuels et al. v. Interstate Oil, Gas & Development Co. for a foreclosure on the bond mortgage was filed. Having obtained proper authority from the court of their appointment, the civil district court for the parish of Orleans, the receivers appeared in the foreclosure proceedings and sought to have the writ of seizure and sale set aside on summary rule. That pleading was dismissed, and the present suit to enjoin the writ was instituted shortly thereafter.

We have carefully considered the voluminous record, including exhibits, etc., and are thoroughly convinced that this is a fight between certain interests, representing the former majority faction of stockholders, which controlled the meeting of October, 1916, on the one part, and the minority, represented by their champions in said meeting on the other. The first significant circumstance indicating that fact is that on the very day that the majority faction, which had selected its board of directors, as above set out, appeared in the suit for receivership and consented to the appointment, the suit to foreclose was filed. This of itself, however, is not sufficient proof upon which to base this conclusion, and we shall therefore proceed to review the other facts and circumstances, which, in our opinion, sustain that view.

Control of the company seems to have been exercised by R. M. Chisholm, Chas. H. Darrah, and associates from its organization, and the other officers and directors appear to have merely carried out their wishes and policies. Under their régime the stock of the company was sold (in some instances with the recommendation and assistance of some of the plaintiffs herein) to widely scattered individuals, on a large portion of which commissions of 25 per cent. were allowed to stock salesmen, who in turn frequently divided with the purchasers in the form of a discount on the purchase price.

All of the first authorized issue having been exhausted in this way, the capital was increased to $100,000, and this additional $40,000 worth of stock was disposed of in the same manner. Whereupon the capital was again increased, the last time to $200,000, and at the date of the stockholders' meeting in 1916 above referred to a total of $126,000 of stock had been sold. In addition to the sale of stock, at the time of the appointment of the receivers, the company had received as the proceeds of oil approximately $14,000, and a bond issue secured by first mortgage upon all of the tangible property of the company had been executed in the sum of $30,000, of which bonds about $12,000 were outstanding when the receivers took charge, making a total sum of $152,000 worth of stock and assets which passed through the hands of the said officers.

As against this there had been expended for the three tracts of land mentioned earlier in this opinion a total of $34,000, and four wells had been bored at a cost of approximately $43,000, and making a total of $77,000, in round figures, for the land and wells. According to the report of the experts appointed at the instance of the receivers, there was also on hand other personal property and equipment amounting to some $3,500 in value. The company's total assets, based upon these figures (not taking into consideration, of course, whatever enhanced value, if any, the property of the company may have had by virtue of the fact that there were three producing oil wells thereon), were a little over $80,000.

The salaries of the office force and field manager during the operations prior to the receivership amounted to approximately $14,500, or a little more than the value of the oil produced. The remainder of the $152,000 above indicated, after deducting assets on hand, was consumed by commissions, office rent, and expenses, taxes, advertising, etc.,

except the $12,000 of bonds, which we will discuss later. The books and records of the company seem to have been very carelessly kept; many checks being issued payable to "cash", "Bearer" "for deposit", etc., with little or nothing to show for what the expenditures were made; stock-salesmen were allowed to overdraw their commission accounts; and many other irregularities appear.

In July, 1915, the directors authorized the execution of the mortgage and issuance of the $30,000 bonds above mentioned. This mortgage covered every species of tangible property of the company. About the same time Chas. L. Darrah, treasurer and field manager of the company, purchased in his own name a lease upon a certain 80 acres of land near that already held by the company for the sum of $200, and thereafter the board of directors authorized the acquisition of this same lease from Darrah for $8,000. The agreement was that he should be paid $4,000 in cash and $4,000 in the stock of the company, but, for some unexplained reason, he was given instead $8,000 of the company's first mortgage "gold" bonds referred to above. These bonds were in denominations of $100 each, matured in five years, and bore interest at the rate of 7 per cent. payable semiannually.

It was the transaction just described which started most of the trouble at the meeting of stockholders in July, 1916, together with the inability of the complaining stockholders to get any definite information from those in charge in regard to the company's affairs. They were very naturally incensed at the fact that one of the officers of the company had been allowed to sell to it property which had cost him $200 for $8,000, represented by bonds secured by first mortgage upon all the company's property.

After the meeting in October, 1916, for some reason, not altogether clear in the record, but probably because of adverse criticism, Darrah agreed with the officers of the company to return the bonds issued to him in consideration of the reconveyance of the lease on the 80 acres of land. The understanding, however, miscarried again, and instead he returned stock of the company and about $2,600 of the bonds. The remainder were never accounted for by him, or at least we cannot find any evidence thereof in the record.

However, most, if not all, of the bonds sued on in the foreclosure which is sought to be enjoined in this case were these same Darrah bonds, according to the testimony of Chisholm. The record of bond sales in the company's books was so defectively and irregularly kept that they did not show in many instances the dates of issuance, and very seldom the names of the persons receiving them. They likewise were sold at considerable discount. The testimony of the plaintiffs in foreclosure (defendants in this suit), which was taken in the city of New Orleans by the receivers, is very indefinite as to when they acquired the bonds sued on, as well as the manner and amounts in which payments were made. A few checks are filed in evidence drawn by defendant Mrs. Englehardt, sometimes in favor of R. M. Chisholm, and at others to "cash," which she says were given for these bonds, and she further testifies that at other times she paid large amounts to Chisholm in cash. She admits that Chisholm looked after her interests in the company very largely. Samuels also swears that he paid large sums in cash to Chisholm, and at other times gave checks for his bonds; but, notwithstanding the fact that he is a business man of large interests, and keeps full records of those interests, he kept none of these bond purchases. Dengler, Hamburger, and Brown are all employés of Samuels, and what has been said as to the latter with reference to the acquisition of

the bonds applies with equal force to them, except on a smaller scale. Singleton was not called as a witness, but Chisholm testifies that at least some of the bonds held by him were among those which were issued to Darrah for the purchase price of the 80 acres of land hereinabove referred to. There is no other evidence in the record to dispute it. In fact, Chisholm testified that practically all of these bonds were of the Darrah issue, and gave that as his reason for not accounting to the company for their proceeds; that is, according to his contention, Darrah had paid for them with the lease on the 80-acre tract, which transaction he still contended was entirely right and proper at the time of taking his testimony herein.

It is true that all of the defendants and other witnesses whose testimony is mentioned above were called by the receivers without reservation, but it is at the same time evident that they were in the nature of hostile witnesses, each and all with an adverse interest; and it is doubtful if their testimony could be taken in the manner which was adopted, as for cross-examination; for, so far as we know, it has been the uniform practice of the trial courts, when one or the other parties calls his adversary for cross-examination, not to permit his own counsel to question him on direct examination until the case is with his side. It must be remembered, as hereinabove indicated, that the affairs of this company were almost entirely in the hands of the interests which appear to be behind this foreclosure, and therefore the other side could not get and had little opportunity of getting any information except what was wrung from them.

[1, 2] The record shows that all of plaintiffs were stockholders in the Interstate Oil, Gas & Development Company, and that they were uniformly represented by Chisholm and others in stockholders' meetings, etc., and were likewise represented by and affiliated with these same gentlemen in the stockholders' meeting of October, 1916, in which the split between the majority and minority took place, largely over this same bond transaction. Some of the plaintiffs also testify that Chisholm looked after the filing of the suit on the bonds. In fact, matters were left so completely in the hands of Darrah and Chisholm, both in the voting of their stock and in the acquisition of the bonds, that we think they must be charged with the knowledge which their agents possessed of the infirmities, even if it be conceded that they are bona fide holders for value without actual notice. R. C. L. vol. 3, p. 1069. In any event, after a showing of fraud has been made in the issuance of the bonds, the burden is shifted to the plaintiffs in foreclosure or holders to prove complete good faith. R. C. L. vol. 3, p. 1033; Neg. Inst. Law, § 59 (Act 64 of 1904).

[3] It is hardly necessary to cite authority to show that the transaction by which Darrah received $8,000 worth of bonds from the company for property which had shortly prior thereto cost him only $200, when both at the time of his own purchase and the attempted sale to the company, he was its treasurer and field manager, charged with looking after its affairs of that character, was illegal and fraudulent. Cook on Corp. vol. 2 (6th Ed.) §§ 652 and 651.

### Estoppel.

[4] We are unable to appreciate upon what theory the lower court sustained the plea of estoppel in this case. Even if the suit were against the corporation instead of its receivers, we are of the opinion that it might attack transactions of the character above described.

The other issues in the case were not passed upon by the district court, nor did it determine the merits of the litigation beyond the question of estoppel.

For the reasons assigned, the judgment ap-

pealed from is annulled and reversed, and this case is hereby remanded in order that the lower court may pass upon the other issues involved herein and decide the matter on its merits; appellee to pay the costs of this appeal; the costs of the lower court to await final judgment.

O'NIELL, J., dissents from what seems to be an opinion on the merits, for a decision of which the case is now remanded.